# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DANA M. MCFALL,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:20cv00044 |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of** | ) | By: PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## *I. Background and Standard of Review*

Plaintiff, Dana M. McFall, ("McFall"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."' *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McFall protectively filed her application for SSI[2] on July 10, 2018, alleging disability as of March 1, 2018, based on heart problems; degenerative disc and spine disease; hypertension; chronic back pain; schizophrenia; depression; an anxiety disorder; a bulging disc in her lower back; emphysema; restless leg syndrome; difficulty sleeping; and problems with her memory. (Record, ("R."), at 15, 202-05, 236, 286.) The claim was denied initially and on reconsideration.

---

[2] On August 22, 2014, McFall filed applications for disability insurance benefits, ("DIB"), and SSI, alleging disability as of February 1, 2014. (R. at 81.) By decision dated February 28, 2018, the ALJ denied McFall's claims. (R. at 81-90.) There is no indication that McFall appealed this decision.

In accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999). Those standards have been superseded by 20 C.F.R. § 404.1520c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous 2018 decision and found it to be "partially persuasive." (R. at 27.) The ALJ noted that the 2018 decision gave similar physical limitations based on conditions that included spinal degeneration, but the ALJ did not find that McFall suffered from a severe mental impairment. (R. at 27, 84.) The ALJ in this case found McFall's depression issues could vary with treatment and circumstances, and the evidence indicated she had significant depression early on before she restarted her medication. (R. at 27.) Thus, the ALJ found McFall's depression was severe. (R. at 17.)

(R. at 137-39, 146-47, 151-53, 155-57.) McFall requested a hearing before an administrative law judge, ("ALJ"). (R. at 158.) A hearing was held on June 2, 2020, at which McFall was represented by counsel. (R. at 36-77.)

By decision dated June 17, 2020, the ALJ denied McFall's claim. (R. at 15-29.) The ALJ found McFall had not engaged in substantial gainful activity since July 10, 2018, the application date. (R. at 17.) The ALJ determined McFall had severe impairments, namely cardiovascular disease and status-post myocardial infarction with stent placement; lumbar degenerative disc disease; restless leg syndrome; and depression, but he found McFall did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found McFall had the residual functional capacity to perform light[3] work, except she could stand and walk up to four hours each; she could sit for six hours; she could occasionally operate hand controls with her left upper extremity; she required a sit/stand option, which allowed her to sit or stand at will, provided she was not off-task more than 10 percent of the workday; she could occasionally climb, balance, stoop, kneel, crouch, crawl and work at unprotected heights and around dust, odors, fumes and pulmonary irritants; she could perform simple, routine tasks with simple instructions and make simple work-related decisions for two-hour increments; she could tolerate occasional workplace changes; and she could frequently interact with supervisors, co-workers and the public. (R. at 20.) The ALJ found McFall was unable to perform any past relevant work. (R. at 27.) Based on McFall's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that McFall could

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2020).

perform, including the jobs of a cashier II, a ticket seller and a toll collector. (R. at 27-28, 71-72.) Thus, the ALJ concluded McFall was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 29.) *See* 20 C.F.R. § 416.920(g) (2020).

After the ALJ issued his decision, McFall pursued her administrative appeals, (R. at 344-46), but the Appeals Council denied her request for review. (R. at 1-5.) McFall then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2020). This case is before this court on McFall's motion for summary judgment filed June 15, 2021, and the Commissioner's motion for summary judgment filed July 14, 2021.

## *II. Facts*

McFall was born in 1966, (R. at 202), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d). She has a ninth-grade education[4] and past work experience as a cashier and a manager of a convenience store. (R. at 49, 64.) McFall testified she began having heart problems in March 2018, resulting in a heart attack and stent placement. (R. at 52-53.) She stated she spent a "great deal" of her time coloring, and she accompanied her sister to the grocery store. (R. at 713.) She stated she relied on her sister to manage the finances in the home, prepare her medications and to perform household chores, as she was unable to engage in many activities of daily living. (R.

---

[4] McFall indicated on her Disability Report that she completed the tenth grade; however, at her hearing, she testified she completed the ninth grade. (R. at 48, 237.) She also stated she attempted to obtain a general educational development, ("GED"), diploma, but failed the test. (R. at 48.)

at 63, 713.) However, in March 2020, McFall reported she obtained full custody of her 13-month-old granddaughter. (R. at 883.) She stated she experienced increased low back pain due to the demands of caring for her granddaughter. (R. at 883.)

In rendering his decision, the ALJ reviewed records from Louis Perott, Ph.D., a state agency psychologist; Dr. Daniel Camden, M.D., a state agency physician; Jo McClain, Psy.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Indian Path Medical Center, ("Indian Path"); The Health Wagon; Norton Community Hospital; Community Physicians Pulmonology; Southern Medical Group, Inc.; Melinda M. Fields, Ph.D., a licensed psychologist; Duffield Family Practice; Holston Medical Group; Western Lee Community Health Clinic; Lonesome Pine Hospital; Wellmont CVA Heart Institute; Mountain States Medical Group, ("Mountain States"); and Norwise OB/GYN.

On March 29, 2018, McFall presented to the emergency department at Norton Community Hospital for complaints of chest pain. (R. at 670-84.) Chest x-rays showed chronic obstructive pulmonary disease, ("COPD"). (R. at 675.) She was diagnosed with non-ST-elevation myocardial infarction, ("NSTEMI"). (R. at 680.) That same day, McFall was transferred and admitted to Indian Path where she underwent a left heart catheterization with stent placement. (R. at 347-602.) McFall's chest pain improved, and her hypertension was better controlled. (R. at 348.) She was discharged on March 31, 2018. (R. at 347-49.)

On May 23, 2018, McFall saw Vanessa Salyer, F.N.P., a family nurse practitioner at Mountain States, and reported improvement in her symptoms since having the heart catheterization. (R. at 603-07.) McFall's heart had normal rate and sounds with regular rhythm and no precordial heave, gallop, click, rub or murmur; auscultation of her lungs revealed normal expiratory time with no wheezing,

rhonchi, friction, rub or diminished breath sounds; she had normal air movement; she exhibited no obvious mood disorder; and her mood and affect were appropriate. (R. at 606.) Salyer diagnosed coronary artery disease. (R. at 606.)

On June 8, 2018, McFall established care at The Health Wagon. (R. at 612-15.) McFall stated she wanted to hurt herself every day. (R. at 614.) She stated she had been off her mental health medication for six months. (R. at 615.) McFall refused a counseling evaluation. (R. at 615.) She was diagnosed with depression, bipolar disorder, schizophrenia, insomnia and restless leg syndrome. (R. at 615.)

On June 26, 2018, McFall was admitted to Norton Community Hospital for observation based on her complaints of chest pain. (R. at 623-69.) Chest x-rays showed minimal, nonspecific left basilar opacities, likely atelectasis; apical lucency suggestive of emphysema; and no evidence of acute cardiopulmonary disease. (R. at 631, 642, 644.) A transthoracic echocardiogram showed left ventricular ejection fraction estimated to be 55 to 60 percent, which was normal. (R. at 635-36.) McFall was discharged on June 27, 2018, with a diagnosis of atypical chest pain. (R. at 623.)

On July 2, 2018, McFall underwent a myocardial perfusion study at Norton Community Hospital. (R. at 619-21.) The study showed no evidence of reversible myocardial ischemia, and her left ventricular ejection fraction was 63 percent at stress and 76 percent at rest. (R. at 620.) On September 25, 2018, McFall presented to the emergency department at Norton Community Hospital for complaints of pain in the left side of her face and head and blurred vision in her left eye. (R. at 692-706.) A CT scan of McFall's head showed no significant acute intracranial findings. (R. at 693.) Chest x-rays were normal. (R. at 695.) McFall was diagnosed with a cluster headache. (R. at 700.)

On November 3, 2018, Dr. Wendy Abbott, D.O., a physician with Southern Medical Group, Inc., saw McFall at the request of Disability Determination Services. (R. at 707-10.) McFall alleged disability due to back and leg pain. (R. at 707.) She stated she was independent with her activities of daily living. (R. at 707.) McFall was in no acute distress; she had a normal gait and ambulated without assistance; her respiratory excursion was full and symmetrical; her lungs had no rales, rhonchi, wheezes or rubs; her heart had regular rate and rhythm with no murmur, gallop, click or rub; all distal pulses were intact, full and equal; her grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; her extremities had no edema, cyanosis or erythema; she was able to sit in no significant distress, walk and stand in the office; she had good, bilateral motor tone and strength in all muscle groups; her reflexes were normal; she had decreased sensation in the left leg; she had no muscle asymmetry, atrophy or involuntary movements; straight leg raising tests were positive, bilaterally; she had joint tenderness in the low back, but no signs of joint instability, inflammation or deformity; she had normal range of motion of all joints; and she had no structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint, except as already mentioned. (R. at 708-10.)

Mental examination revealed McFall was fully oriented and cooperative; she did not appear to be depressed or anxious; she was able to communicate with no deficits; her recent and remote memory were intact; she had good insight and cognitive function; and she showed no signs of mood instability or concentration difficulty. (R. at 709.) Dr. Abbott diagnosed back and leg pain, likely secondary to surgery to repair ruptured lumbar discs.[5] (R. at 709.) Dr. Abbott opined McFall

---

[5] McFall stated she sustained a work-related back injury in 1996, which resulted in two surgeries, one in 2013 and another in 2014. (R. at 707.) The record shows that on May 14, 2014, McFall underwent a lumbar spine laminotomy with decompression of nerve roots. (R. at 791.)

"unlikely" would be able to walk and/or stand for a full workday; she "may be" able to sit for a partial workday with allotted occasional breaks; she would be limited to lifting and carrying items weighing less than 10 pounds because her condition "may be" exacerbated by lifting or carrying excessive weight; and she should refrain from excessive bending, stooping and crouching. (R. at 709.)

On November 15, 2018, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated McFall at the request of Disability Determination Services. (R. at 712-16.) McFall related depressive and anxiety-related symptoms. (R. at 713.) She alleged molestation by a family member from age nine to 14. (R. at 713.) McFall reported an onset of depressive symptoms at age 14, with the severity of her symptoms increasing over the past two years. (R. at 713.) She stated she tended to isolate, as she did not want to be around others. (R. at 713.) McFall stated she saw "a black figure, I know it's the devil," at least monthly. (R. at 713.) She related, "it tells me that life ain't no good for me," and "that I need to end it, kill myself." (R. at 713.) McFall reported onset of auditory and visual hallucinations at age 14. (R. at 713.)

On mental status examination, McFall was cooperative; her hygiene, grooming and eye contact were adequate; she did not experience difficulty comprehending questions; she spontaneously generated conversation in a relevant and coherent fashion; she exhibited no evidence of thought process or thought content impairments; she exhibited no evidence of hallucinations or delusions during the evaluation; her mood was depressed with tearfulness; her affect was blunted, although inappropriate at times with inappropriate laughter; she had impaired judgment; her immediate memory was intact; her recent and remote memory were impaired; her insight was fair; and her persistence was normal. (R. at 715.) Fields opined that social functioning was impacted by depressed mood, tearfulness, inappropriate laughter and blunted affect. (R. at 715.) Fields diagnosed major

depressive disorder, recurrent, severe, with psychotic features. (R. at 716.) Fields opined McFall "unlikely" would complete a typical workweek without presentation of psychiatric symptoms, and she "likely" would have difficulty navigating stressors inherent in gainful employment, such as the need to interact appropriately with supervisors, co-workers or the public. (R. at 716.) She deemed her prognosis as guarded with appropriate treatment and environmental support. (R. at 716.)

On November 26, 2018, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding McFall was moderately limited in her ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage herself. (R. at 104.) Perrott opined McFall could perform simple, repetitive tasks. (R. at 104.) Perrott also completed a mental assessment, finding McFall was moderately limited in her ability to understand, remember and carry out detailed instructions; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to travel in unfamiliar places or use public transportation. (R. at 108-10.) Perrott stated that McFall's work-related mental abilities were, otherwise, not significantly limited. (R. at 108-10.) He also opined McFall could complete simple, repetitive tasks. (R. at 110.)

On November 26, 2018, Dr. Daniel Camden, M.D., a state agency physician, found McFall could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; sit up to four hours and stand and/or walk up to six hours; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs; occasionally balance, stoop, kneel and crouch; never climb ladders, ropes and scaffolds and crawl; and she should avoid concentrated exposure to temperature extremes, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation

and work hazards, such as machinery and heights. (R. at 106-08.) Dr. Camden indicated no manipulative, visual or communicative limitations. (R. at 107.)

On April 5, 2019, McFall established care with Dr. James Winegar, M.D., a physician with Duffield Family Practice, for chronic back pain and post laminectomy syndrome.  (R. at 739-43.) McFall's lungs were clear to auscultation, bilaterally; her heart had regular rate and rhythm; her extremities revealed no edema; she had good peripheral pulses; and an EKG revealed normal sinus rhythm. (R. at 741.)  On April 21, 2019, McFall reported her hypertension was well-controlled; her major depression was stable with medication; and she could perform routine activities without chest pain.[6] (R. at 735-38.) McFall was in no acute distress; her lungs were clear to auscultation; her heart had regular rate and rhythm without murmur; her lower back had moderate tenderness; her extremities had no edema; and her affect was normal.[7] (R. at 736.)

On May 15, 2019, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF, finding McFall was moderately limited in her ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage herself. (R. at 125.) She opined McFall could perform simple, routine tasks with simple one- or two-step instructions and limited contact with co-workers and the general public. (R. at 124.) McClain also completed a mental assessment, finding McFall was moderately limited in her ability to

---

[6] At subsequent office visits, McFall continued to state her medication helped, she reported her hypertension was well-controlled; her depression was stable with medication; she could perform routine activities without chest pain; and she denied shortness of breath. (R. at 749, 883, 888, 894, 906, 913, 918, 928.) In October 2019, McFall reported pain relief with her medication regimen. (R. at 911.)

[7] McFall's examination findings remained unchanged at subsequent office visits, except in May and June 2019, McFall was in moderate distress, and she had positive straight leg raising tests. (R. at 752, 756, 885, 890, 896, 901, 909, 915, 930.)

understand, remember and carry out detailed instructions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 129-31.) McClain stated that McFall's work-related mental abilities were, otherwise, not significantly limited. (R. at 129-30.) She also opined McFall could complete simple, repetitive tasks. (R. at 130.)

On May 15, 2019, Dr. Robert McGuffin, M.D., a state agency physician, found McFall could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; sit and stand and/or walk up to six hours in an eight-hour workday; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs, crouch and crawl; and occasionally climb ladders, ropes and scaffolds and stoop. (R. at 127-29.) Dr. McGuffin found McFall had an unlimited ability to balance and to kneel. (R. at 128.) He indicated no manipulative, visual, communicative or environmental limitations. (R. at 128.)

On June 6, 2019, McFall saw Dr. Winegar and reported she had to take frequent breaks due to pain. (R. at 749-54.) X-rays of McFall's lumbar spine showed post-operative changes from a left L5 laminectomy; mild levocurvature of the lumbar spine with mild multi-level discogenic degenerative changes; mild to moderate right-sided facet arthropathy of the lower lumbar spine; and a spinal stimulator device.[8] (R. at 751.) McFall was alert and in moderate distress; her lungs were clear to auscultation; her heart had regular rate and rhythm without murmur; she had moderate tenderness of the lower back; her extremities had no edema; she

---

[8] In 2014, McFall had a Medtronic muscle stimulator inserted in her lower back, but she stopped using it due to random shocks. (R. at 23, 735, 739.)

had positive straight leg raising tests; and her deep tendon reflexes were symmetric. (R. at 752.) She was given an injection for back pain. (R. at 753.)

On June 20, 2019, Dr. Winegar completed a medical assessment, finding McFall could occasionally lift and carry items weighing 10 pounds and five pounds frequently; she could stand and/or walk up to four hours in an eight-hour workday and could do so for 20 minutes without interruption; she could sit up to four hours in an eight-hour workday and could do so for 30 minutes without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she had a limited ability to reach, to handle and to push/pull; she was restricted from working around heights, moving machinery, temperature extremes, humidity and vibration; and she would be absent from work more than two days a month. (R. at 874-76.)

On July 19, 2019, McFall saw Dr. Winegar and reported she was totally disabled from work due to back pain. (R. at 918-23.) She reported she had difficulty performing routine housework at times, particularly vacuuming. (R. at 918.) A July 11, 2019, CT scan of McFall's lumbar spine showed postsurgical changes at the L5 hemilaminectomy; degenerative disc disease in the lumbar spine with disc bulge most prominent at the L4-L5 level, which likely did not contribute to significant stenosis of the central canal; neuroforaminal stenoses were present at the L4-L5 and L5-S1, bilaterally; and a pars defect at the L5 level on the left. (R. at 920-21.) McFall was in no acute distress; her lungs were clear to auscultation; her heart had regular rate and rhythm with no murmur; her extremities had no edema; her affect was normal; she had moderate tenderness in her lower back; and she had some stiffness in her knees. (R. at 921.)

On October 28, 2019, McFall presented to the emergency department at Lonesome Pine Hospital for complaints of chest pain and hypotension. (R. at 941-

77.) McFall reported back pain and gait problems, but denied agitation, confusion and decreased concentration. (R. at 942.) Chest x-rays showed no acute cardiopulmonary abnormality. (R. at 948-49.) An echocardiogram showed an ejection fraction of 55 to 60 percent. (R. at 965-69.) An EKG showed sinus rhythm; low voltage, precordial leads; and abnormal R-wave progression, early transition. (R. at 974.) On October 29, 2019, McFall was discharged with a diagnosis of chest pain; urinary tract infection; essential hypertension; tobacco abuse; coronary artery disease with previous myocardial infraction; hyperkalemia; and hyperlipidemia. (R. at 951.)

On November 11, 2019, McFall saw Dr. Winegar for follow up after being hospitalized with an episode of chest pain and chest tightness. (R. at 899.) An EKG revealed sinus rhythm without acute ST or T-wave change. (R. at 901.) Dr. Winegar referred McFall to a cardiologist for evaluation. (R. at 903.)

On November 19, 2019, McFall saw Dr. John R. Bertuso, M.D., a cardiologist with Wellmont CVA Heart Institute, for complaints of chest discomfort and shortness of breath. (R. at 877-82.) McFall's respiratory pattern was nonlabored with no rales, rhonchi or wheezes; her heart had normal sinus rhythm and apical impulse with no gallop, rub or murmur; her bilateral radial and posterior tibial pulses were normal; she had no clubbing or edema in her lower extremities; she had no musculoskeletal deformities; and her mood was appropriate. (R. at 881.) An EKG showed early R-wave transition, possibly representing normal variant or true posterior wall myocardial infarction coma. (R. at 881.) Dr. Bertuso diagnosed chest tightness, coronary artery disease and familial hypercholesterolemia. (R. at 881.) He ordered a nuclear stress test. (R. at 882.)

On May 12, 2020, Dr. Winegar completed a medical assessment, finding McFall could occasionally lift and carry items weighing 15 pounds and five pounds frequently; she could stand and/or walk up to one hour in an eight-hour workday and could do so for 15 minutes without interruption; she could sit up to four hours in an eight-hour workday and could do so for 30 minutes without interruption; she could occasionally stoop and never climb, kneel, balance, crouch or crawl; she had a limited ability to reach and to push/pull; she was restricted from working around heights, moving machinery, temperature extremes, humidity and vibration; and she would be absent from work more than two days a month. (R. at 925-27.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2020). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist

in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall,* 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays,* 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

McFall argues the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of Dr. Abbott, Fields and Winegar, and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) McFall contends the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368

(Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 416.920c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[9]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 416.920c(b)(2) (2020).[10] In

---

[9] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5) (2020).

[10] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to

evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 416.920c(b)(3), (c)(3)-(5).

---

Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 416.945(a) (2020). The ALJ found McFall had the residual functional capacity to perform light work, except she could stand and walk up to four hours each; she could occasionally operate hand controls with her left upper extremity; she required a sit/stand option, which allowed her to sit or stand at will, provided she was not off-task more than 10 percent of the workday; she could occasionally climb, balance, stoop, kneel, crouch, crawl and work around unprotected heights and around dust, odors, fumes and pulmonary irritants; she could perform simple, routine tasks with simple instructions and make simple work-related decisions for two-hour increments; she could tolerate occasional workplace changes; and she could frequently interact with supervisors, co-workers and the public. (R. at 20.)

In making this residual functional capacity finding, the ALJ found the opinions of Dr. Abbott, Fields and the state agency consultants "partially persuasive" and Dr. Winegar's opinions "not persuasive." (R. at 25-26.) First, the ALJ considered Dr. Abbott's November 2018 opinion that McFall would "unlikely" be able to walk and/or stand for a full workday; she "may be" able to sit for a partial workday with allotted occasional breaks; she would be limited to lifting and carrying items weighing less than 10 pounds because her condition "may be" exacerbated by lifting or carrying excessive weight; and she should refrain from excessive bending, stooping and crouching. (R. at 25, 709.) The ALJ explained that, while the record included evidence of degenerative disc disease, there were no clinical findings of nerve root compromise or upper extremity limitations consistent with the degree of limitation assessed by Dr. Abbott. (R. at 25.) *See* 20 C.F.R. § 416.920c(c)(2) (stating that the more consistent a medical opinion is with other medical sources, the more persuasive the medical opinion will be). As the ALJ discussed in his decision, while McFall exhibited positive straight leg raises during her consultative examination

with Dr. Abbott, she also maintained normal gait, full and equal motor strength and normal range of motion and reflexes. (R. at 709-10.)

The ALJ found Dr. Winegar's extensive work-related limitations "not persuasive." (R. at 25-26, 874-76, 925-27.) The ALJ considered both opinions from Dr. Winegar, which stated, in part, that McFall was unable to sit for more than 30 minutes without interruption, stand and walk for more 20 minutes without interruption, perform most postural activities and would experience significant absenteeism. (R. at 25.) In evaluating these opinions, the ALJ stated the record did not support Dr. Winegar's manipulative and upper extremity limitations because there was no objective evidence that McFall had limited use of her upper extremities or hands. (R. at 25.) Despite this finding, the ALJ limited McFall to occasional operation of hand controls with her left upper extremity. (R. at 20.) Additionally, the ALJ explained that Dr. Winegar's findings were inconsistent with the overall treatment record, which showed that, with conservative treatment, McFall maintained intact gait, strength and reflexes and that her symptoms were conservatively managed. (R. at 25-26, 736, 741, 756, 890, 896, 901, 909, 915, 930.) Furthermore, McFall reported pain relief with her medication regimen. (R. at 911.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ found the state agency physician's assessment, who, after reviewing the medical evidence, opined McFall could perform light work, but with four hours of sitting, "partially persuasive." (R. at 26, 106-08.) The ALJ found the evidence indicated McFall would need to have some position changes that allowed for sitting and that her standing/walking ability was more limited than found by the state agency physicians. (R. at 26, 106-08, 127-29.) Thus, the ALJ assessed greater limitations in his residual functional capacity finding by limiting McFall to standing

and walking four hours each. (R. at 20.) Based on this, I find the opinion evidence supports the ALJ's physical residual functional capacity finding.

Next, the ALJ also discussed the supportability and consistency of Fields's November 2018 opinion and found it was "partially persuasive." (R. at 26, 716.) Fields opined McFall "unlikely" would complete a typical workweek without presentation of psychiatric symptoms, and she "likely" would have difficulty navigating stressors inherent in gainful employment, such as the need to interact appropriately with supervisors, co-workers or the public. (R. at 716.) The ALJ explained that, while McFall demonstrated some tearfulness and inappropriate laughter during her consultative examination with Fields, this occurred in the context of explaining her history of abuse and prior mental health issues. (R. at 26.) The ALJ noted Fields's opinion was vague, and the record did not indicate McFall would be substantially stressed with social interaction. (R. at 26.) The ALJ also explained that Fields's limitations were inconsistent with the overall medical record, which showed McFall's depression improved with medication. (R. at 23, 26, 735, 752, 757, 885, 890, 930.)

The ALJ also found the state agency psychologists' assessments "partially persuasive." (R. at 26-27.) The ALJ found that the overall evidence supported limitations in McFall's ability to perform complex tasks and to tolerate workplace changes, but did not support social limitations to the degree assessed by the state agency psychological consultants. (R. at 26-27.) Specifically, the ALJ found the limitation to occasional interaction was not consistent with McFall's overall treatment record. (R. at 26-27.) The ALJ noted the evidence indicated McFall's tendency toward depression would limit her ability to deal with complex work, supporting the limitation to simple tasks. (R. at 26.) The ALJ also noted the evidence did not show chronic tearfulness or inappropriate behavior, which indicated she

would not experience much social interaction difficulty with normal situations, including work. (R. at 26-27.) Therefore, the ALJ found McFall could *frequently* interact with supervisors, co-workers and the public. (R. at 20.)

Despite, McFall's reported improvement with medication, the state agency psychologists opined she was moderately[11] limited in her ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage herself. (R. at 104, 125.) In addition, the state agency psychologists opined McFall was moderately limited in her ability to understand, remember and carry out detailed instructions; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to travel in unfamiliar places or use public transportation. (R. at 108-10, 129-31.) McClain further opined McFall could perform simple, routine tasks with simple one- or two-step instructions with *limited* contact with co-workers and the general public. (R. at 124.) This evidence supports, and is consistent with, Fields's opinion that McFall "likely" would have difficulty navigating stressors, such as the need to interact appropriately with supervisors, co-workers or the public. (R. at 716.)

McFall stated she would get overwhelmed when she was around people, she could be around only three or four people, if that, at a time, and she tended to isolate herself. (R. at 47, 259-60, 713.) Although she stated she had never been fired from a job because of problems getting along with people, she stated she did not get along with authority figures, she could not handle stress, and "I don't" handle changes in a routine. (R. at 260.) The ALJ noted the evidence indicated a "mild preference" of

---

[11] The regulations define "moderate limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as fair. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2020).

not being around others; thus, finding the limitation to frequent social interaction and simple tasks accommodated this. (R. at 26.) Furthermore, although the vocational expert testified a significant number of jobs existed that an individual who was limited to frequent contact with supervisors, co-workers and the public could perform, he also stated there would be no jobs available should the individual be limited to only occasional interaction with supervisors, co-workers and the public, as found by the state agency psychologists. (R. at 69-72.) Based on this, I cannot find substantial evidence exists to support the ALJ's consideration of the opinion evidence and his mental residual functional capacity finding, and I will recommend the court remand McFall's claim to the Commissioner for further consideration.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence as to McFall's physical residual functional capacity;

2. Substantial evidence does not exist in the record to support the ALJ's consideration of the opinion evidence as to McFall's mental residual functional capacity finding; and

3. Substantial evidence does not exist in the record to support the Commissioner's finding that McFall was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McFall's motion for summary judgment and the Commissioner's motion for summary judgment, vacate

the Commissioner's decision denying benefits and remand McFall's claim to the Commissioner for further development.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     March 1, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

- 23 -